

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable Wm. J. Lawson
Secretary of State
Austin, Texas

Dear Sir:

Opinion No. O- 4047
Re: Construction of subsection
(c) of Article 7084, Revis-
ed Civil Statutes, 1925.

We acknowledge receipt of your request for an opin-
ion as to whether or not The Union Terminal Company is exempt
from payment of franchise tax as provided by Subsection (c)
of Article 7084 of the Revised Civil Statutes, 1925, as amend-
ed by the 47th Legislature, Regular Session.

The Union Terminal Company was incorporated by F.G.
Pettibone, and others, in March, 1912, for the following pur-
poses:

"This corporation is created for the purpose
of the construction, maintenance and operation of
a terminal railway in and about the City of Dallas,
Dallas County, Texas, and the country surrounding
the said City of Dallas, Texas, with all of the
rights and powers conferred upon terminal railways
in Title 21 of the Revised Statutes of the State
of Texas and amendments thereof, and especially
with the powers conferred by an act of the 30th
Legislature approved by the Governor of Texas, April
23, 1907, and especially with powers conferred upon
railroad companies by chapters 8 and 9 of Title 94
of the Revised Statutes of the State of Texas and
amendments thereto relating to railroads; and es-
pecially the right to issue bonds in excess of its
authorized capital stock and of constructing, main-
taining and operating passenger and freight sta-
tions, railroad yards and other facilities neces-
sary or proper to afford terminal facilities to
all railroads now or here entering the City of

> Dallas, Texas, and the right to exercise all oth-
> er powers now or hereafter conferred by the laws
> of the State of Texas on terminal railway compan-
> ies and subject to the provisions of an act pass-
> ed by the 32nd Legislature of the State of Texas
> and approved by the Governor of Texas on the 20th
> day of March, 1911, relating to wharf and terminal
> companies."

The articles of incorporation provided for the issu-
ance of 480 shares of stock with a par value of $100 each.

On April 1, 1912, the terminal company, 8 railroads
and Continental and Commercial Trust and Savings Bank, entered
into what was known as an "Operating Agreement" wherein it is
stated that said railway companies were interested in securing
an economical, efficient and satisfactory system of handling
railway traffic within and through the City of Dallas and that
the railway companies desired to unite in the establishment of
joint terminal passenger facilities and in the construction and
operation of a union station for the use of said railway com-
panies and other railway companies which might be admitted.
That in order to effectuate such purposes and desire the rail-
way companies had caused to be organized The Union Terminal Com-
pany, the stock of which was owned 60 shares by each of the 8
railway companies.

To further effectuate said desires and purposes The
Union Terminal Company negotiated a loan of $5,000,000 from
the Continental and Commercial Trust and Savings Bank and exe-
cuted bonds and a mortgage on all property then owned or there-
after applied to secure said indebtedness. Each railway com-
pany also agreed to and did transfer and assign to the Continent-
al and Commercial Trust and Savings Bank, as trustee, 58 of its
60 shares of stock in The Union Terminal Company to secure the
due and punctual performance of the agreement between the par-
ties thereto. The railway companies further agreed to pay the
interest and principle on said bonds and on other fixed charges
and taxes in the maintenance and operation of The Union Termi-
nal Company.

Article 7084, Revised Civil Statutes, 1925, Subsec-
tion (a) provides for a franchise tax on all domestic and for-
eign corporations chartered or authorized to do business in
Texas.

Honorable Wm. J. Lawson, page 3

Subsection (c) of said Article creates an exemption as follows:

"Provided, however, that this article shall not apply to corporations organized as terminal companies not organized for profit, and having no income from the business done by them. . . ."

It has been held many times that the franchise tax is not a tax on property or income, but that it is a charge made by the State against a corporation for the privilege granted to do business in the State. United North and South Development Co. v. Heath, 78 S. W. (2d) 650.

But the Legislature has seen fit by Article 7084, subsection (c), supra, to exempt those corporations which: (1) are organized as terminal companies; (2) have no income from business done by them, and (3) not organized for profit.

It is elementary that taxation is the general rule and exemption from taxation the exception. All persons or corporations claiming an exemption from taxation must bring themselves clearly within the exception because the statute granting such exemption must be strictly construed.

The fact that The Union Terminal Company is a corporation organized as a terminal company needs no discussion.

The second fact to be determined is whether or not The Union Terminal Company has income from the business done by it.

The Legislature has not seen fit to define what is meant by the term "income." That being true we are required by the rules of statutory construction to give the term its common and ordinary acceptation.

In Volume 4, Words and Phrases, First Series, page 3504, it is stated:

"The term 'income' ordinarily means 'that which comes into or is received by any business or investment of capital, without reference to outgoing expenditures.'"

In the case of Houston Belt and Terminal Company v. Clark, 122 S. W. (2d) 358, the Court of Civil Appeals, in discussing the exemption here in question on an organization very similar to The Union Terminal Company, held that:

"The statutes used the word 'income' or the phrase 'income from business done by them,' in the sense of any income, as distinguished from net income."

As heretofore shown The Union Terminal Company was organized to conduct a terminal and it has erected buildings, tracks, sheds, etc., to carry on its terminal business.

It appears from the facts submitted that The Union Terminal Company has received income from business done by it. Among other items of income is the sum of $272,671.07 total rent income from January 1, 1940, to December 31, 1940. There are also items for rental of space, such as $3500 from the Union News Company, $900 from bonded Transit Company, $150 from Interstate Company, $900 from Pullman Company and $1200 from Dallas Interchange and Inspection Bureau. It may be argued that the money received from rental of office space is not income from business done. If the money received for rental of office space is not considered a part of the revenue from the operation of the terminal facilities such fact does not preclude the inclusion of such income because the statute does not require that only the money it receives from the operation of the terminal facilities but from all business done by the corporation. In the case of Potomac Electric Power Co. v. Rudolph, 29 Fed. (2d) 626 (certiorari denied, 278 U. S. 656) the court said:

"There is no rule which permits a court to say that the measure of a tax for the privilege of doing business, where income from property is the basis, must be limited to that derived from property which may be strictly said to be actually used in the business."

Certainly the same rule would apply to the construction of a tax exempt statute unless a clear intent to the contrary is shown. Such intent is not shown in the statute here under consideration.

224

It is therefore apparent that The Union Terminal Company has income from business done by it.

Whether or not the Union Terminal Company was "organized for profit" presents a more difficult problem.

The Union Terminal Company is entitled to all of the privileges granted it under the statute whereby it was incorporated and is burdened by the duties required of it by law. For instance all such terminal companies are as a matter of law common carriers and as such are subject to regulation by the Railroad Commission. It may be required to not only furnish its facilities to Railroads who are not owners of its stock, but the revenues it receives shall be fixed by the Commission. Certainly any rates for the use of the facilities which might be fixed by the Railroad Commission would be, as a matter of law, required to be such an amount as to insure to The Terminal Company a reasonable return on its investment. The railway companies and The Union Terminal Company agreed that the terminal company would acquire, construct and operate necessary tracks, lands and other terminal facilities and construct a passenger station in order to furnish the Railway companies an economical, efficient and satisfactory system of handling their passenger traffic.

By the Operating Agreement of April 1, 1912, the Union Terminal Company, in consideration of the sum to be paid by the railway companies, agreed to acquire necessary real estate and construct the necessary union stations and also granted the use of its terminal facilities, subject to certain conditions, to said railway companies for 99 years. By said agreement the 8 railway companies each agreed to pay, severally 1/8th of the amount of interest and principle of the $5,000,000 First Mortgage Bonds; to pay, severally, 1/8th of the amount, principle and interest, of all other bonds; to pay 1/8th of all sums for the leasing or acquisition of facilities for the use of the railway companies; to pay 1/8th of all taxes, rates, levies, benefits, assessments and other governmental charges of every kind. It was further agreed that all income or charges would be used to defray the operation expenses as far as possible and that the remainder would be paid by the railway companies on a monthly user basis.

Not only has The Union Terminal Company provided for all of its initial costs or capital, interest oh its indebtedness

Honorable Wm. J. Lawson, page 6

and all operating expenses but it has made provision for the retirement of its bonded indebtedness which would at maturity thereof leave all of its assets free of debt.

The term "profit" as applied to a business organization is held to include and cover benefits of every kind in excess of costs or expenses, and profit in business has been held to include all gain, advance in the value of assets, good will and dividends, in excess of and beyond expenditures. Volume 6, Words and Phrases, First Series, page 5659.

The Union Terminal Company has taken care in a rather ingenious manner to see that it does make a profit. It has contracted to the effect that at some time in the future it will own all of its very valuable property without a debt of any kind. In fact on April 1, 1942, it would have accomplished this result, but "out of the goodness of its heart" it granted to the railway companies on February 1, 1937, an extension of the time for the payment of the $5,000,000 bonded indebtedness by refunding the bonds with another $5,000,000 bond issue to mature on February 1, 1967.

We do not think it was the intention of the Legislature to require a terminal company to not make a profit on a daily, monthly or yearly basis. But on the contrary that if it was within the contemplation of the parties prior to and at the time of the organization that a profit should be made or that the organization was capable of making a profit then it should not be exempt.

Not only will The Union Terminal Company make a very substantial profit but the contemplation of the parties who incorporated The Union Terminal Company is very forcefully shown when they contracted to deliver all of the shares of stock, except 2 for each railway company, to the trustee nominated in the trust agreement of April 1, 1912, and agreed in said agreement that such trustee would receive and collect all dividends. What are dividends if not profit.

In the case of Houston Belt and Terminal Railway Co. v. United States, 250 Fed. 4, the court said:

"It may be that the tenant companies (railway companies), organized the terminal company to provide a convenient joint agency for the performance of certain of their duties as carriers, and

with no view to profit to be derived from its organization. It was, however, legally organized as a corporation capable of earning and paying dividends to its stockholders, and the fact that it has not done so does not make it the less a corporation engaged in the business and organized for profit, within the meaning of the corporation tax law. Profit from an organization and operation could result with stockholders in other ways than in dividends."

We are therefore of the opinion that The Union Terminal Company was organized for profit.

In view of the foregoing you are respectfully advised that The Union Terminal Company is not exempt from the payment of franchise tax as provided by Article 7084, Revised Civil Statutes, 1925, as amended.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By Richard H. Cocke
Assistant

RHC:db



APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN